IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAROL L. JONES,

        Plaintiff,

    v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

CIVIL ACTION FILE NO.

1:05-CV-2050-JFK

## ORDER AND WRITTEN OPINION

Plaintiff in the above-styled case brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration which denied her application for a period of disability, disability insurance benefits, and supplemental security income. For the reasons set forth below, the court **ORDERS** that the Commissioner's decision be **REVERSED** and that this action be **REMANDED** for further proceedings.

## I.    Procedural History

Plaintiff Carol L. Jones filed applications for a period of disability, disability insurance benefits, and supplemental security income on August 24, 2002, alleging that

she became disabled on August 14, 2002. [Record ("R.") at 58-60, 576-79]. After her applications were denied initially and on reconsideration, she requested an administrative hearing, which was held on June 18, 2004, before an Administrative Law Judge ("ALJ"). [R. at 25-49, 580-632]. A decision was issued by the ALJ on January 24, 2005, denying Plaintiff's claims. [R. at 15-23]. Plaintiff requested review of the ALJ's decision, but the Appeals Council denied her request on June 2, 2005, making the hearing decision the final decision of the Commissioner. [R. at 6-11]. On July 22, 2005, Plaintiff filed the above-styled action in this court seeking review of the final decision. [Doc. 2].

## II.    Facts

Plaintiff Carol L. Jones, thirty-eight (38) years old at the date of the administrative hearing, has past work experience as a housekeeper, maid, front desk clerk, cashier, cook, and driver. [R. at 16]. The ALJ found that Plaintiff has hearing loss, obesity, diabetes mellitus, and sarcoidosis. [R. at 20]. Although these impairments are "severe" within the meaning of the Social Security Regulations, the ALJ found that they did not meet or equal, either singly or in combination, the requirements for any impairment listed in Appendix 1, Subpart P, Regulations No. 4. [Id.]. The ALJ found that Plaintiff could perform her past relevant work as cashier,

2

motel desk clerk, and receptionist.  [R. at 22].  The ALJ, therefore, concluded that Plaintiff was not under a disability.  [Id.].

The ALJ's decision [R. at 15-23] states the relevant facts of this case as modified herein as follows:

The claimant testified at the hearing that she was born on March 1, 1966, and that she was thirty-eight (38) years old.  She stated that she has a 12th grade education and also completed some clerical training in 1991.  Her past work experience includes employment as a housekeeper, maid, front desk clerk, cashier, cook and driver.  She stated that she is 5'4" tall, is left handed and weighs about 233 lbs.  She alleged that she became disabled on August 14, 2002, due to diabetes mellitus, sarcoidosis, disorders of her back, shortness of breath, leg numbness, tingling and swollen feet, swelling of eyes, hearing loss, memory problems, headaches and a damaged nerve of her left leg.  Her last job was at National-Rent-a-Car where she worked for about two (2) to three (3) years on a part time basis.  She tried to work as security for the IRS but did not pass the physical examination because of her hearing problems.  She does not have a hearing aid now, but when she did, she was doing fine and her hearing improved.  She stated that she does not have a hearing aid because Medicaid will not pay for its repair.

3

The claimant further testified that she can read and write but that she cannot write for long periods of time because her arthritis gives her great pain. She has problems combing her hair and with her grip. She is unable to open a jar by herself. She has not worked since 2002 and currently is receiving food stamps. The claimant is divorced and lives with her two (2) children ages fifteen (15) and seventeen (17).

The claimant alleged that she takes three (3) high blood pressure medications and that her feet are swollen all the time. She stated that she has to elevate her feet to alleviate the swelling. She takes Coumadin, and she stated that this prevents her from taking other medications and treatment. The claimant stated that she needs to use a nebulizer four (4) times every day for about thirty (30) to forty (40) minutes. After the treatment, she claims that she gets shaky and sleepy and needs to take naps. Her daughter helps with house chores and shopping. The claimant uses a wheelchair when she goes shopping. She alleged that she can stand and walk for ten (10) minutes and can sit for thirty (30) minutes but has pain. If she lifts her legs, she can sit longer. She claims that her elbows hurt every time she does any lifting or carrying. She alleged that on a scale from one (1) to ten (10), her pain is an eight (8) after taking her medications. She also alleged taking hot showers and soaking her feet in Epson salt

4

to alleviate the pain.  She was hospitalized for a blood clot in her lungs and is afraid to get another one.

The claimant alleged that she is not able to work because of the following impairments: diabetes mellitus, sarcoidosis, disorders of her back, shortness of breath, leg numbness, tingling and swollen feet, swelling of eyes, hearing loss, memory problems, headaches and damaged nerve in her left leg.  The medical evidence of record shows that on March 22, 2001, the claimant underwent a pulmonary function test which showed an FEV1 of 2.20 or 86%.  The test was administered by Subrahmanya Bhat, M.D., who noted that the results appeared to be normal.  (Exhibit 3-F, p. 25).  Dr. Bhat also ordered at CT scan of the chest because of the claimant's complaints of chest pain with shortness of breath and wheezing.  On April 4, 2001, the claimant had the CT scan done, and it showed interstitial pulmonary opacities scattered with the lungs, most pronounced within each lower lobe but also involved in portions of the right middle lobe, left upper lobe and right upper lobe.  The pleura was normal, and there was mild adenopathy at the level of the azygoesophageal recess of the mediastinum.  The heart size was at the upper limits of normal.  (Exhibit 3-F, p. 21).

On April 18, 2001, Dr. Bhat performed a fiberoptic bronchoscopy and found that the vocal cord, trachea and carina were within normal limits.  There was generalized

5

erythema of the indobronchial mucosa.  The main stem bronchus, upper lobe, middle lobe, and lower lobe segments were normal in both the right and left side.  Dr. Bhat's impressions were: mild erythema of the mucosa; no indobronchial mass lesions and rule out sarcoidosis-specimens sent to histopathology and cytologic examinations. (Exhibit 3-F, pp. 10, 11).

On May 30, 2002, Joseph N. Saba, M.D., examined the claimant as a referral from Praya Mam, M.D., because of problems with the claimant's left lower extremity and lower back.  The claimant reported having pain in her shoulder, both wrists and all of her joints.  She also complained of pain in her left leg and lower back.  Dr. Saba's assessment was chronic lumbar syndrome, with possible left L5 radiculopathy; and diabetes mellitus type II with mild peripheral neuropathy and mild left common peroneal neuropathy at the level of the fibular head.  There was no evidence of diabetic retinopathy.  He also noted:  allergy to Combid; possible phlebitis of the left lower extremity;  common  migraine;  polyarthralgia;  significant  overweight  state;  tubal ligation; nicotine dependence; sarcoidosis of the lungs and significant neurosensory hearing loss, bilateral, congenital.  Dr. Saba stated that he did not believe that the sarcoidosis was related to the pain in her left leg.  (Exhibit 4-F, pp. 19-20).

On June 7, 2002, the claimant underwent a duplex venous ultrasound of the left lower extremity that was ordered by Dr. Saba.  The study showed that the common femoral, superficial femoral, profunda femoral, and popliteal veins demonstrated normal characteristics of spontaneity, phasicity, and augmentation.  These venous structures also demonstrated normal compression.  It was noted that it was a normal duplex ultrasound examination of the veins in the left lower extremity without evidence of deep vein thrombosis (DVT).  (Exhibit 4-F, p. 12).

On June 18, 2002, a magnetic resonance imaging (MRI) of the lumbar spine without contrast showed very mild degenerative changes of the lumbar spine.  (Exhibit 4-F, p. 8).  On June 20, 2002, an MRI of the left leg showed that the skeletal structure was intact without evidence of fracture or destructive lesion.  Musculature of the left leg demonstrated normal signal intensities.  Subcutaneous tissues were normal, and neurovascular bundles were intact.  The knee joint had normal fluid volume, and the knee and ankle joints were normally aligned.  No areas of edema were delineated. (Exhibit 4-F, p. 5).

On July 1, 2002, Michael R. Plemons, M.D., performed a chest x-ray (two (2)) views).  Dr. Plemons noted that the heart and pulmonary vessels appeared normal and that there was a mild prominence of the hilar structures, but no definite evidence of

7

AO 72A
(Rev.8/82)

adenopathy was seen on the study.  He also noted that the findings were stable compared to another study performed on March 6, 2001.  Dr. Plemons' impression was that there were no acute cardiopulmonary findings.  (Exhibit 2-F, p. 19).

On July 25, 2002, Dr. Bhat performed another pulmonary function test which showed an FEV1 of 2.27 or 92%.  He noted that the results of the examination appeared to be within normal limits.  (Exhibit 3-F, p. 3).

On August 22, 2002, John O. Ogundipe, M.D., Ph.D., stated that the claimant has diabetes, asthma and sarcoidosis, which is interfering with her ability to work.  Dr. Ogundipe noted that she will continue treatment and that claimant felt that she is unable to continue her present work assignments.  (Exhibit 5-F).  On November 11, 2002, John O. Ogundipe, M.D., the claimant's treating physician, completed a medical statement form stating that the claimant had type II diabetes mellitus, sarcoidosis and peripheral neuropathy.  (Exhibit 23-F).

On December 20, 2002, the claimant had a routine chest x-ray to monitor her sarcoidosis condition.  The study showed that the heart and mediastinal contour was of normal size and shape.  The lungs were clear and fully expanded, and the soft tissues and bony structures were normal.  The chest (two (2) views) were normal with no evidence of hilar or mediastinal adenopathy or acute pneumonic process.  (Exhibit

8

10-F, p. 16).  On this same date, a pulmonary function test was performed showing an FEC of 2.64 or 73% and an FEV1 of 2.07 or 67%.  The final impression was early obstructive ventilatory impairment, as evidenced by decreased FEF 25-75%; decreased maximum voluntary ventilation (MVV); and post bronchodilators, with no significant improvement on FVC, FEV1 and FEF.  However, it was noted that this finding does not prevent the use of bronchodilators.  The blood gasses were normal. (Exhibit 10-F, pp. 2-3).

On March 4, 2003, David Guttman, M.D., a state medical consultant, performed a non-examining physical residual functional capacity assessment of the claimant.  Dr. Guttman opined that the claimant was capable of performing light level work.  He noted the following postural limitations: avoid climbing of ladders, ropes, and scaffolds, limited to climbing of ramps and stairs occasionally.  The claimant was also limited to frequent stooping, crawling, kneeling and crouching.  Dr. Guttman did not note any manipulative, visual, communicative or environmental limitations.  Dr. Guttman opined that the claimant's allegations were credible and consistent with the medical evidence of record.  (Exhibit 11-F).

On March 5, 2003, the claimant was examined at the Southern Regional Medical Center for a complaint of abdominal pain.  After evaluation and tests were performed

with negative results, she was discharged with instructions to see her primary care physician if the symptoms did not improve in two (2) days. Yvette Murray-Thomas, P.A., noted that the claimant had no limitations and that she was able to return to work the next day. (Exhibit 19F, pp. 41-51).

On April 11, 2003, Jerry R. Wilborn, M.D., ordered a two (2) view chest-x-ray of the claimant which showed mild pulmonary interstial peribronchial opacity within each lung base. It was noted that the findings were similar to those noted on another x-ray done on December 20, 2002. This may be due to mild interstitial edema or inflammation. On May 7, 2003, another x-ray showed interstial pulmonary opacities within the mid-and-lower lung zones. The heart was mildly enlarged, and it was noted that these findings may be secondary to mild congestive heart failure. It was also noted that there was worsening of the interstitial opacities from the prior study performed on April 11, 2003. (Exhibit 19-F, pp. 26-40).

On April 14, 2003, the claimant was evaluated at the American Hearing Centers as a consultative evaluation from the state Disability Adjudication Services. A pure tone testing revealed a moderately severe flat sensory-neural hearing loss in both ears. Speech reception thresholds were obtained at 55 dB in both ears, which showed good agreement with the pure tone average. Word recognition ability was obtained in the

AO 72A
(Rev.8/82)

90% range in both ears at presentation levels of 65 dBHL and 85 dBHL.  The evaluation showed that the claimant's condition can improve by using a hearing aid. (Exhibit 13-F).

On May 7, 2003, the claimant was hospitalized at the Southern Regional Medical Center.  Adele Chituru, M.D., examined the claimant and noted that she had arrived at the emergency room complaining of chest pain, shortness of breath and lower extremity edema.  Dr. Chituru's diagnoses were: "1)  Chest pain.  Rule out myocardial infraction.  2)  Abnormal electrocardiogram.  3)  Insulin dependent diabetes mellitus.  4)  History of sarcoidosis and emphysema.  5)  Positive tobacco abuse.  6)  Low potassium level."  (Exhibit 19-F, pp. 22-24).

On August 14, 2003, the claimant went to the Southern Regional Medical Center emergency room complaining of neck pain and mild congestive heart failure.  It was noted on the treatment form that the claimant admitted to being non-compliant with treatment.  Upon discharge, the attending physician noted that claimant had to take her medications and stop smoking.  (Exhibit 19-F, pp. 3-5).

On September 28, 2003, the claimant was hospitalized at the Southern Regional Medical Center for a pulmonary embolism.  Anthony W. Cheng, M.D., was her attending physician, and he noted that the claimant had been admitted with an

11

impression of acute pulmonary embolism, sarcoidosis, pneumonia, and diabetes mellitus.  She was administered intravenous steroids, antibiotics and nebulizer.  She was discharged in stable condition on October 3, 2003.  During the course of hospitalization, the claimant underwent a bilateral lower extremity venous study which showed no evidence of acute or chronic deep venous thrombosis in either lower extremity.  (Exhibit 21-F, pp. 17-18).

On February 2, 2004, the claimant was hospitalized at the Southern Regional Medical Center with a diagnosis of pulmonary embolism.  A CT angiogram showed bilateral bowel lobe bronchial artery with filling defect.  During the hospitalization, the claimant was treated with potassium supplements and intravenous heparin.  The final diagnoses were: recurrent pulmonary embolism, diabetes mellitus, asthma and hypokalemia.  (Exhibit 21-F, pp. 3-4).

On February 18, 2004, Anthony W. Cheng, M.D., another treating physician, stated that the claimant's diagnoses were: pulmonary embolism, sarcoidosis and deep vein thrombosis.  He opined that the claimant is not able to work but that her prognosis is fair.  (Exhibit 24-F).

On June 14, 2004, Dr. Cheng completed a pulmonary residual functional capacity questionnaire.  He noted that the claimant's diagnoses were: pulmonary

12

embolism, sarcoidosis, asthma and diabetes.  He opined that the claimant was able to sit for five (5) minutes and stand for ten (10) minutes, that she is not able to lift any amount of weight, and that she cannot twist, stoop, crouch, squat or climb ladders.  The claimant was also limited to occasional climbing of stairs.  (Exhibit 25-F).

## III.    Standard of Review

An individual is considered to be disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).    The  impairment  or  impairments  must  result  from  anatomical, psychological, or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. §§ 423(d)(2) and (3).

The scope of judicial review of the Commissioner's decision is limited.  The court's function is (1) to determine whether the record, as a whole, contains substantial evidence to support the findings and decision of the Commissioner and (2) whether the

13

Commissioner applied proper legal standards.  See Vaughn v. Heckler, 727 F.2d 1040, 1042 (11th Cir. 1984).  Substantial evidence is more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).

The claimant has the initial burden of establishing the existence of a "disability" by demonstrating that she is unable to perform her former type of work.  If the claimant satisfies her burden of proving disability with respect to her former type of work the burden shifts to the Commissioner to demonstrate that the claimant, given her age, education, work experience, and impairment, has the capacity to perform other types of jobs which exist in the national economy.  See Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983).

Under the regulations as promulgated by the Commissioner, a five (5) step sequential procedure must be followed when evaluating a disability claim.  See 20 C.F.R. §§ 404.1520(a) and 416.920(a).  In the sequential evaluation, the Commissioner must consider in order: (1) whether a claimant is gainfully employed, 20 C.F.R. §§ 404.1520(b) and 416.920(b); (2) whether claimant has a severe impairment which significantly limits her ability to perform basic work-related functions, 20 C.F.R. §§

14

404.1520(c) and 416.920(c); (3) whether claimant's impairments meet the Listing of Impairments, 20 C.F.R. §§ 404.1520(d) and 416.920(d); (4) whether claimant can perform her past relevant work, 20 C.F.R. §§ 404.1520(e) and 416.920(e); and (5) whether claimant is disabled in light of age, education, and residual functional capacity, 20 C.F.R. §§ 404.1520(f) and 416.920(f).  If, at any step in the sequence, a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  See 20 C.F.R. §§ 404.1520(a) and 416.920(a).

## IV.    Findings of the ALJ

The ALJ made the following findings:

1.    The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant's hearing loss, obesity, diabetes mellitus and sarcoidosis are considered "severe" impairments based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

15

5.      The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the following maximum residual functional capacity: light work with the following additional limitations, limited hearing and avoidance of climbing of ladders ropes and scaffolds, and avoidance of concentrated exposure to dangerous machinery, unprotected heights, fumes, odors, dust, gases and poorly ventilated places.

7.      The claimant's past relevant work as cashier, desk clerk, receptionist did not require the performance of work-related activities precluded by her residual functional capacity. (20 CFR §§ 404.1565 and 416.965).

8.      The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work.

9.      The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision. (20 CFR §§ 404.1520(f) and 416.920(f)).

[R. at 22-23].

## V.      Discussion

In the present case, the ALJ found at the first step of the sequential evaluation that Plaintiff had not engaged in any substantial gainful activity since her alleged onset date. [R. at 17]. At the second step, the ALJ determined that Plaintiff has hearing loss, obesity, diabetes mellitus, and sarcoidosis. [R. at 20]. Although these impairments are

16

"severe" within the meaning of the Social Security Regulations, the ALJ found at the third step that they did not meet or equal, either singly or in combination, the requirements for any impairment listed in Appendix 1, Subpart P, Regulations No. 4. [R. at 20].  The ALJ found at the fourth step of the sequential evaluation that Plaintiff was able to perform her past relevant work as a cashier, motel desk clerk, and receptionist.  [R. at 22-23].  Accordingly, the ALJ concluded that Plaintiff was not disabled at any time through the date of the decision.  [Id.].

Plaintiff Jones contends that the ALJ committed a number of errors in reaching his decision, and she makes three (3) arguments in support of her claim.  [Doc. 14]. Plaintiff first argues that the ALJ's decision to discredit the opinions of her treating physicians was not supported by substantial evidence and was the result of a failure to apply proper legal standards.  Plaintiff also contends that the ALJ improperly rejected the credibility of her statements.  Plaintiff Jones' final argument is that the ALJ failed to evaluate the impact of her obesity on other impairments.

Plaintiff argues that the ALJ erred when he decided not to credit the opinions of Plaintiff's treating physicians, Drs. John Ogundipe and Anthony Cheng.  [R. at 21]. Dr. Ogundipe opined in a medical statement dated November 11, 2002, that Plaintiff Jones was unable to work full time because of her chronic type II diabetes, sarcoidosis,

and peripheral neuropathy.  [R. at 544].  Dr. Cheng opined in a medical statement dated February 18, 2004, that Plaintiff was unable to work due to pulmonary embolism, sarcoidosis, and deep vein thrombosis.  [R. at 545].  Four (4) months later, on June 14, 2004, Dr. Cheng completed a "Pulmonary Residual Functional Capacity Questionnaire" and opined that Plaintiff could not work due to pulmonary embolism, sarcoidosis, asthma, and diabetes.  [R. at 546-49].

The ALJ stated in his decision that he "considered the opinion of the treating physicians," but he found that "their conclusions are not supported by the objective medical evidence of record."  [R. at 21].  The ALJ did not specifically refer to the November 2002 opinion of Dr. Ogundipe or the June 2004 opinion of Dr. Cheng.  Dr. Cheng's February 2004 opinion was implicitly referenced by the ALJ, but he only offered one reason for rejecting this opinion: "Dr. Cheng stated that the claimant has deep venous thrombosis but all tests and studies were negative for this condition."  [R. at 21].  Instead of relying on the treating physicians' opinions, the ALJ stated that he gave "great weight to the opinion of the state medical consultant which is well supported by all the evidence of the record."  [Id.].

Section 404.1527(d) of the regulations promulgated by the Administration states in pertinent part:

18

(2)     Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations. . . .

        (i)     Generally, the longer a treating source has treated you . . . the more weight we will give to the source's medical opinion. . . .

20 C.F.R. § 404.1527(d)(2).  The Eleventh Circuit has consistently held that absent a showing of good cause to the contrary, opinions of treating physicians must be accorded substantial or considerable weight by the Commissioner.  See Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 1000 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Broughton v. Heckler, 776 F.2d 960, 961 (11th Cir. 1985).  Good cause has been found when the opinion of a treating physician is so brief and conclusory that it lacks persuasive weight or when it is unsubstantiated by any clinical or laboratory findings.  See Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Wilson v. Heckler, 734 F.2d 518 (5th Cir. 1984) (citing Warncke v. Harris, 619 F.2d 412, 417 (5th Cir. 1980)).  "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and

19

the failure to do so is reversible error." <u>Lewis</u>, 125 F.3d at 1440 (11th Cir. 1997) (citing <u>MacGregor</u>, 786 F.2d at 1053).

In the present case, there is no indication that the ALJ "clearly articulated the reasons for giving less weight" to the opinions of treating physicians Ogundipe and Cheng. When discussing his reasons for discrediting their opinions, the ALJ mentioned one relatively minor aspect of Dr. Cheng's February 2004 medical statement: a diagnosis of deep vein thrombosis. [R. at 21, 545]. The ALJ offered no other explanation for rejecting this opinion. With respect to Dr. Ogundipe's November 2002[1] opinion and Dr. Cheng's four (4) page pulmonary residual functional capacity report completed in June 2004, the ALJ failed to offer any explanation for finding them not credible.

In rejecting the treating physicians' opinions that Plaintiff was unable to work, the ALJ relied heavily on the opinion of the non-examining state medical consultant, Dr. David Guttman, who is board certified in pediatrics. [R. at 21, 401-08]. The

---

[1]It appears that the ALJ may have had good cause to reject Dr. Ogundipe's opinion that Plaintiff was unable to work full time. The form completed by Dr. Ogundipe in November of 2002 instructed the physician to offer supporting information, but there is no indication that he did so. [R. at 544]. However, the ALJ did not actually discuss why he rejected Dr. Ogundipe's opinion, so the court is unable to determine whether he applied proper legal standards.

20

Eleventh Circuit, however, has repeatedly "cautioned against rejecting the opinions of treating physicians in favor of the contrary conclusions of consultants who have merely examined an applicant's medical records" absent a showing of good cause. Hillsman v. Bowen, 804 F.2d 1179, 1182 (11th Cir. 1986); accord Jones v. Bowen, 821 F.2d 551, 554 (11th Cir. 1987) (citing Broughton v. Heckler, 776 F.2d 960, 961 (11th Cir. 1985)). To "attempt to evaluate disability without personal examination of the individual and without evaluation of the disability as it relates to the particular person is medical sophistry at its best." Spencer on behalf of Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985) (citations omitted).

In spite of these warnings, the ALJ rejected the opinions of treating physicians Ogundipe and Cheng in favor of a non-examining state medical consultant. Dr. Guttman not only was a non-examining physician, but he reviewed only a portion of Plaintiff's records when he issued his opinion. Plaintiff notes that Dr. Guttman did not have access to well over a hundred pages of treatment records because his opinion was issued in March of 2003. This was prior to the time Plaintiff suffered a pulmonary embolism in September of 2003. Moreover, Dr. Guttman stated that there was no "treating or examining source statement(s) regarding the claimant's physical capacities in [the] file" that he examined. [R. at 407]. While the ALJ stated that he gave great

21

weight to Dr. Guttman's opinion because it was "well supported by all the evidence of the record," substantial evidence does not support the ALJ's decision.  [R. at 21]. For these reasons, remand for further proceedings is warranted.

Plaintiff Jones next argues that the ALJ improperly rejected her allegations of limitations caused by sarcoidosis, obesity and other impairments. [Doc. 14 at 19-21]. Plaintiff testified to the following with respect to her breathing problems: "I'm wheezing all the time.  I can walk to a certain point and sit down and I'll be wheezing, breathing real heavy."  [R. at 612].  Plaintiff stated that she uses a nebulizer four (4) times a day for breathing treatments which last about thirty (30) to forty (40) minutes each. [R. at 612].  Plaintiff testified that the treatment makes her shaky and sleepy and that she needs to take a nap afterwards.  [R. at 613].  She alleged that she can stand and walk for ten (10) minutes and can sit for thirty (30) minutes but has pain.  [R. at 616].

When a claimant seeks to establish disability through subjective testimony of pain or allegations of limitations, a three (3) part "pain standard" established by the Eleventh Circuit applies. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). "The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a

severity that it can be reasonably expected to give rise to the alleged pain." Id.  If the ALJ decides to discredit a claimant's testimony of subjective complaints, he must give explicit and adequate reasons for doing so.  Id.; Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

In the present case, the ALJ found that "the claimant's allegations are not fully credible since the allegations regarding her limitations are not equally matched by the objective medical tests and findings." [R. at 21].  The only specific reason offered by the ALJ in support of his decision to discredit Plaintiff's allegations was that there was "evidence on the record that the claimant has been non-compliant with her treatment and has decreased her Coumadin dosage." [R. at 21].  It is not clear whether the ALJ applied the pain standard as required by the Eleventh Circuit.  The ALJ wrote that Plaintiff's allegations are not "equally matched" by the medical findings.  The Commissioner argues that this statement amounted to a finding that "the medical evidence did not confirm her allegations of disabling symtomatology." [Doc. 17 at 26].  There is no indication, however, that the ALJ determined whether Plaintiff's "medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain," as he was required to do.  Holt, 921 F.2d at 1223.

23

The court also finds the credibility determination made by Dr. Guttman, the non-examining physician, to be significant.  In the assessment, Dr. Guttman was asked to evaluate: whether Plaintiff's subjective complaints and symptoms were attributable to medically determinable impairments; whether the severity or duration of the symptoms were disproportionate to the expected severity or duration on the basis of Plaintiff's impairments; and whether the severity of the symptoms and their alleged effects on function were consistent with the total medical and nonmedical evidence. [R. at 406].  In response to these instructions, Dr. Guttman stated in his report that he found Plaintiff's complaints "credible and consistent."  [R. at 406].  Although the ALJ wrote in his decision that he gave "great weight" to Dr. Guttman's opinion, the ALJ apparently rejected this aspect of Dr. Guttman's opinion without explanation.  There is no evidence that any treating physician ever questioned Plaintiff's allegations of limitations or pain.

The ALJ explained that he discredited Plaintiff's allegations because there was "evidence on the record that the claimant has been non-compliant with her treatment and has decreased her Coumadin dosage."  [R. at 21].  This is a legitimate explanation, but the court finds that in light of the other problems regarding the ALJ's credibility determination, it does not amount to substantial evidence.  Upon remand, the ALJ

24

should discuss his application of the pain standard and explain whether he finds that Plaintiff has impairments that could cause her allegations of limitations. If he finds that there is no objective medical evidence confirming the severity of Plaintiff's allegations and that her condition is not sufficiently severe that it can reasonably be expected to cause her alleged limitations, then he should offer explicit and adequate reasons for making this finding.

Plaintiff Jones' final argument is that the ALJ failed to properly evaluate her obesity. The ALJ found that Plaintiff's obesity was a severe impairment, but he concluded that Plaintiff "did not have any impairment or combination of impairments which met the criteria of any of the listed impairments." [R. at 20]. The Commissioner contends that the analysis regarding the listings was the only analysis that the ALJ was required to perform. However, Social Security Ruling 02-1p provides that the listings provisions "also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity."

The record does not indicate that any physician ever discussed the impact of Plaintiff's obesity on her functional limitations. Thus, it appears that the ALJ's failure

25

to discuss Plaintiff's obesity in more detail was a relatively insignificant error. However, because remand is warranted on other bases, the court notes that upon remand the ALJ should consider the effects of Plaintiff's obesity at other steps in the evaluation process.

## VI.   Conclusion

For all the foregoing reasons and cited authority, it is **ORDERED** that the decision of the Commissioner denying benefits be **REVERSED** and that this action be **REMANDED** for further proceedings in accordance with the above discussion. See Melkonyan v. Sullivan, 501 U.S. 89, 111 S. Ct. 2157, 115 L. Ed. 2d 78 (1991).

**SO ORDERED**, this 26th day of APRIL, 2006.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

26